UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| Jeffrey R. JONES, et al., | Case No.: 23-cv-1102-AGS-MMP |
|---|---|
| Plaintiffs, | **ORDER DENYING MOTION TO DISMISS COUNTERCLAIMS (ECF 31)** |
| v. | |
| Steven R. BARRETT, et al., | |
| Defendants. | |

This case involves two competing narratives. Plaintiffs say it's about wrongful termination; defendants, about embezzling employees. Only the second version is at issue in the present motion to dismiss certain counterclaims.

## BACKGROUND[1]

In 2013, California-based plaintiffs Jeff and Connie Jones formed a business relationship with Colorado-based defendants/counterclaimants Steven Barrett and Wayne Glasser. (ECF 19, at 7.) "Jeff Jones was hired to run the day-to-day operations of [certain franchise] restaurants in California," known as the Harbor Foods entities, and his "wife, Connie Jones, was hired to perform bookkeeping and accounting for the restaurants." (*Id.*) Jeff Jones also negotiated a buy-in arrangement that would grant him part-ownership of the enterprise, contingent on making capital-contribution payments. (*See id.* at 8–11.) He ceased making these payments after October 2017, though he continued to manage the restaurants. (*Id.* at 12.)

Unbeknownst to his Colorado business partners, Jeff Jones was allegedly providing "no meaningful oversight" over the restaurants' compliance with "tax obligations" and "payroll and human resource matters," resulting in "substantial tax liability" and

---

[1] At this early stage, the Court accepts "the factual allegations in the [counterclaim] as true" and construes them "in the light most favorable to the [counterclaimants]." *GP Vincent II v. Estate of Beard*, 68 F.4th 508, 514 (9th Cir. 2023).

1

"numerous labor claims." (ECF 19, at 16–17.) And "in late 2020, Jeff Jones refused to sign a personal guaranty" for a Small Business Administration COVID-19 loan, despite "previously telling" counterclaimants Barrett and Glasser that he would do so. (*Id.* at 11.) During "2021 and 2022, Barrett and Glasser became suspicious that Jeff Jones and Connie Jones were not acting in the best interest of the Harbor Foods Entities." (*Id.* at 13.)

While running the restaurants, Jeff and Connie Jones allegedly "used Harbor Foods funds and employee time to provide goods and services to an Oggi's restaurant" "owned by [newly joined counter-defendant] P2W, Inc." and "managed by [their] son, [counter-defendant] Brent Jones." (ECF 19, at 13.) For the benefit of that restaurant and their son, the Jones couple purchased "a QuickBooks account," paid "the deposit for construction work," and bought "an order of paper supplies," all with Harbor Foods resources. (*Id.* at 14.) In September 2022, after receiving complaints about Jeff Jones involving "sexual harassment and discrimination based on sexual orientation," Barrett and Glasser's growing suspicions culminated in the Jones couple's termination. (*Id.* at 18.) Subsequent investigation purportedly revealed "that for years Jeff and Connie Jones misrepresented material financial information" about the "performance" of the restaurants. (*Id.* at 19.)

## DISCUSSION

The Jones couple, their son Brent Jones, and P2W, Inc.—collectively, "the Joneses"—move to dismiss five of the nine counterclaims. "To survive a motion to dismiss," a counterclaim "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quotations omitted); *Snap! Mobile, Inc. v. Croghan*, No. 18-cv-4686-LHK, 2019 WL 3503376, at *2 (N.D. Cal. Aug. 1, 2019) (applying *Iqbal* to counterclaims). The claimant must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677.

**A.     Count 3: Aiding and Abetting Breach of Fiduciary Duty**

First, the Joneses move to dismiss count 3—aiding and abetting the breach of a fiduciary duty—as to Brent Jones and P2W. To state such a claim, the pleader must

allege "defendant's actual knowledge" of a third party's fiduciary breach and defendant's "substantial assistance or encouragement" of it. *Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 343 (2014).

### 1. *Actual Knowledge*

The Joneses argue that there are "no supporting factual allegations other than summary averment that 'Brent knew'" his father Jeff Jones was breaching his fiduciary duty. (ECF 31, at 14.) "California law requires that a defendant have actual knowledge of tortious activity before [defendant] can be held liable as an aider and abettor." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118–19 (C.D. Cal. 2003). Yet, while allegations of fraud must be pleaded with particularity, "knowledge" and "other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). According to the amended counterclaim, Brent and P2W "knew that Harbor Foods funds and employee time were being used for non-Harbor Foods matters," including "expenses of P2W, Inc." (ECF 31, at 24–25.) Brent Jones and P2W also "knew that [Jeff] Jones sought to misappropriate money" and that in doing so, Jeff Jones "would be breaching his fiduciary duty" to Harbor Foods. (ECF 19, at 23.) This is plausible, which is enough. "Generally, courts have found pleadings sufficient if they allege generally that defendants had actual knowledge of a specific primary violation." *Neilson*, 290 F. Supp. 2d at 1120.

### 2. *Substantial Assistance*

"To plead substantial assistance," the complaint must plausibly set out that the aider/abettor's "conduct was a substantial factor in bringing about the injury." *In re Mortg. Fund '08 LLC*, 527 B.R. 351, 365 (N.D. Cal. 2015). "[E]ven ordinary business transactions . . . can satisfy the substantial assistance element of an aiding and abetting claim if the [aider/abettor] actually knew those transactions were assisting the [breacher] in committing a specific tort." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006). Parties can be liable for aiding and abetting if they "knew that a tort had been, or was to be, committed, and acted with the intent of facilitating the commission of that tort." *Gerard v. Ross*, 251 Cal. Rptr. 604, 613 (Ct. App. 1988).

Brent Jones purportedly provided false "invoices and expenses incurred by P2W" for Harbor Foods to pay. (ECF 19, at 24.) He apparently organized and assigned "administrative tasks" to benefit P2W and "us[ed] Harbor Foods employee time to perform" them—including "prepar[ing] the formation documents for P2W" and "ordering furniture for [its] restaurant." (*Id.* at 9, 14.) According to the counterclaim, he illicitly received Harbor Foods' financial data and leveraged it "to secure a lease" for P2W's eatery. (*Id.* at 9, 15.) These misappropriations were accomplished only with the assistance and participation of Brent Jones and P2W. They intended to, and did, "facilitat[e]" their "commission," at least when the facts are viewed in the light most favorable to nonmovants. *See Gerard*, 251 Cal. Rptr. at 613. For instance, it was presumably easier for Jeff Jones to disguise an improper transfer when his son Brent Jones provided a false invoice, reflecting sums in fact owed by P2W, for that purpose. (*See* ECF 19, at 14–15, 24.) These actions substantially assisted in the success of the wrongful conduct, and thus were "a substantial factor in bringing about the injury" suffered. *See In re Mortg. Fund '08 LLC*, 527 B.R. at 365.

The Joneses advance only technicalities in opposition: "Jeff and Connie, not Brent, spent Harbor Foods monies on items for P2W, Inc.'s Apple Valley Oggi's restaurant"; and a false invoice "was sent to Connie, and the check was paid by Jeff, not Brent." (*See* ECF 31, at 15.) These facts might have more import if Brent Jones and P2W were charged as principals. But for aiding-and-abetting purposes, it is enough that Brent Jones's and P2W's knowing assistance helped the misappropriated property reach its intended destination. Count 3 survives in its entirety.

B.  **Fraud Claims**

The Joneses next attack the fraud claims as deficient and time-barred.

1.  *Counts 5 and 6: Intentional and Negligent Misrepresentation*

For the misrepresentation claims, the Joneses focus on a single shared element: reliance. (ECF 31, at 16–17); *see Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 311 Cal. Rptr. 3d 564, 592–93 (Ct. App. 2023) (setting forth the elements of both types of

4

misrepresentation). For both intentional and negligent misrepresentation, plaintiff's reliance must be "justifiable," that is, "circumstances were such to make it *reasonable* for plaintiff to accept defendant's statements without an independent inquiry or investigation." *Wilhelm v. Pray, Price, Williams & Russell*, 231 Cal. Rptr. 355, 358 (Ct. App. 1986). And the "reasonableness" of any reliance is assessed not by a community standard, but "by reference to the plaintiff's knowledge and experience." *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 68 Cal. Rptr. 3d 828, 856 (Ct. App. 2007).

The Joneses insist that Barrett and Glasser could not have been duped by any alleged misrepresentations because they "had complete control and access to all relevant information." (ECF 31, at 16.) Having enjoyed this access "all along," Barrett and Glasser cannot now assert injury when they "could have or should have known" at the time that these representations were false. (*Id.* at 18.) In other words, according to the Joneses, "[t]he truth was obvious." (*Id.* at 17.)

The problem with this argument is that it incorrectly presumes that Barrett and Glasser had a duty to investigate Jeff Jones's representations. When "there is a fiduciary relationship, the usual duty of diligence to discover facts does not exist." *Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 210 Cal. Rptr. 387, 404 (Ct. App. 1985). Only when a party "*actually* becomes aware of facts which would make a reasonably prudent person suspicious of wrongdoing by a fiduciary" does any "duty to investigate" arise. *Hudson v. Foster*, 283 Cal. Rptr. 3d 822, 843 (Ct. App. 2021) (emphasis added). In addition, "a defendant cannot hinder the plaintiff's discovery [of a fiduciary breach] through misrepresentations and then fault the plaintiff for failing to investigate." *Weatherly v. Universal Music Publ'g Grp.*, 23 Cal. Rptr. 3d 157, 162 (Ct. App. 2004). According to the counterclaim, the Jones couple went to great lengths to cover their fraudulent tracks with "misleading financial statements" and bogus entries in QuickBooks, such as "cash deposits . . . that were never actually deposited," "incorrect dates," and "non-Harbor Foods transactions" entered "as if they were Harbor Foods expenses." (ECF 19, at 27.) At the pleading stage, Barrett and Glasser have plausibly alleged that they had no actual

knowledge of the truth and that they justifiably relied on their fiduciary's assurances without further investigation.

Thus, the motion to dismiss the misrepresentation claims is denied.

### 2. Count 7: Fraudulent Concealment

Turning to the counterclaim for fraudulent concealment, the Joneses again primarily train their firepower on the "reliance" element. (ECF 31, at 19–20); *see In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1189 (C.D. Cal. 2010) (setting forth elements). And they largely rely on the "same analysis." (ECF 31, at 20.) That is, "as President, Vice President, and majority shareholders" of the Harbor Food entities, Barrett and Glasser had contemporaneous access to "the truth of all these matters," including the accounting disparities and dubious bookkeeping entries that they now complain of. (*Id.*) Thus, the Joneses contend, Barrett and Glasser could not have been deceived by any fraudulently concealed facts. But, for many of the same reasons mentioned above, this line of attack again fails.

A defendant "in a fiduciary relationship with the plaintiff" has a duty to disclose "material" facts—those that would cause a party to "behave differently" if revealed. *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267–68 (C.D. Cal. 2007). One may "prove reliance on an omission" by showing "that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Mirkin v. Wasserman*, 858 P.2d 568, 574 (Cal. 1993).

Due to the fiduciary relationship, Barrett and Glasser "had no reason to question whether the financial statements" Jeff Jones provided were accurate, nor to doubt him when he "downplayed the lawsuits" brought by employees. (ECF 34, at 19; ECF 19, at 17.) Barrett and Glasser explicitly claim that they would have "terminated Jeff and Connie Jones years ago" and ensured that Harbor Foods "complied with its tax obligations and the Labor Code" but for the Jones couple's concealment of alleged tax, labor, and financial misdeeds. (*See* ECF 19, at 32–33.) For pleading purposes, Barrett and Glasser have plausibly alleged their justifiable reliance on material omissions.

Beyond their primary objection to the "reliance" element, the Joneses protest that Barrett and Glasser "fail to allege the who, what, where[,] why[,] and how as to the concealed facts." (ECF 31, at 21.) But the counterclaim details numerous specific concealments. For example, Jeff Jones reputedly pocketed cash receipts of "$1,066" and "$1,633" on June 6, 2018, and "$2,447 and "$832" on June 13, 2018—each misleadingly camouflaged by Connie Jones's false accounting entries "documenting the cash deposits" of these sums, "even though the money was never actually deposited in Harbor Foods' bank accounts." (ECF 19, at 20.)

The counterclaim adequately pleads each element of fraudulent concealment with sufficient particularity at this stage.

### 3. *Statute of Limitations on Fraud Claims*

Finally, the Joneses argue that because "the gravamen of [all three] fraud claims is alleged misrepresentation of financial statements beginning in 2016," they are time-barred. (*See* ECF 31, at 22.) They point out that Barrett and Glasser could "have known the truth" earlier with diligent investigation. (*Id.*)

The statute of limitations for "an action for relief on the ground of fraud" is "three years" from "the discovery, by the aggrieved party, of the facts constituting the fraud." *See* Cal. Civ. Proc. Code § 338, 338(d). A fraud is generally deemed discovered, triggering the statute-of-limitations clock, when the injured party has "suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005). Yet when "a fiduciary relationship exists, facts which ordinarily require investigation may not incite suspicion . . . [and] the usual duty of diligence to discover facts does not exist." *Hobbs*, 210 Cal. Rptr. at 404. In the absence of such a duty, "the limitations period does not begin to run until [a claimant] *actually* discovers the facts constituting the cause of action, even though the means for obtaining the information are available." *Id.* "A claim may be dismissed as untimely pursuant to a [Federal Rule of Civil Procedure] 12(b)(6) motion 'only when the running of the statute [of limitations] is apparent on the face of the complaint.'" *United*

*States ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013).

According to the counterclaim, Barrett and Glasser "became suspicious during the course of 2021 and 2022" but they did not actually discover the fraud until after "Jeff Jones' termination on September 20, 2022." (ECF 34, at 20.) The Joneses' alleged misdeeds were unearthed only after their termination, when Barrett and Glasser "further investigated the extent of Jeff and Connie Jones' misconduct." (ECF 19, at 18–19.) Up until that time, Barrett and Glasser "relied on Jones' expertise" and his "fiduciary duty." (*Id.* at 27–28.) So when the original counterclaim was filed in August 2023, it was within three years of even these earliest suspicions. (*See* ECF 6.) Thus, it is not "apparent on the face" of the pleading that the claims are time-barred. *See Air Control Techs.*, 720 F.3d at 1178.

Unpersuaded, the Joneses point to *Czajkowski v. Haskell & White, LLP*, 144 Cal. Rptr. 3d 522 (Ct. App. 2012), for the proposition that a party has "a duty to investigate even where a fiduciary relationship exists when he has notice of facts sufficient to arouse the suspicions of a reasonable person." (ECF 35, at 11 (quoting *Czajkowski*, 144 Cal. Rptr. 3d at 530 (cleaned up).) The Joneses imagine that bookkeeping discrepancies that *could have been discovered with an investigation* are the sort of suspicious facts that trump reliance on a fiduciary relationship and require the investigation in the first place—curiously circular reasoning. At any rate, the suspicious circumstances in *Czajkowski* were not merely *capable* of being discovered—they were already well known. Almost a decade before the *Czajkowski* plaintiff CEO sued the defendant accounting firm, he was aware of the suspicious collapse of his business. That is, his company folded after incurring "significant tax liability in 2002," which should have made him wary of the "retained professionals who had been dealing with or reporting on the Company's finances." *Czajkowski*, 144 Cal. Rptr. 3d at 531. Also, in 2005 one of the defendant firm's accountants told plaintiff that any "significant" tax-related information "would have been included in footnotes in financial statements" prepared by the firm. *Id.* at 526. Yet those reports "did not include tax liability information" of any kind, let alone

"the Company's failure to pay its taxes," which had already led to its demise. *Id*. The *Czajkowski* court held that, based on "all of these circumstances," plaintiff "had a duty to investigate even a fiduciary's actions," so his 2010 lawsuit against the accounting firm was "barred by the applicable [two-year] limitations period." *Id*. at 532.

Put another way, *Czajkowski* stands for the proposition that when one fiduciary landmine has exploded, you should look for others buried nearby. It does not mean that—as the Joneses would have it—litigants must preemptively sweep their fiduciary's representations for hidden mines.

There are no suspicious facts predating the limitations period here that approach the company-wide ruin in *Czajkowski*. For pleading purposes, it is plausible that, before 2021, Barrett and Glasser had no reason to question their previously trusted fiduciaries. Indeed, according to the counterclaim, the Jones couple "intentionally and willfully misrepresented the financial performance of the companies" to avoid such suspicions. (ECF 19, at 19.) The counterclaim only mentions a few arguably irregular incidents that came to light before 2021: (1) in 2017 Jeff Jones "stopped making installment payments" on his employment and buy-in agreements (*id.* at 10); (2) in 2019 "labor claims ha[d] been asserted against" Harbor Foods, which Jeff Jones "downplayed" (*id.* at 17); and (3) in 2020 Jeff Jones "refused to sign a personal guaranty" for an SBA loan for the enterprise (*id.* at 11–12). In other contexts, these events might raise misgivings and require further inquiry. At the pleading stage, however, it is plausible that such actions *by a fiduciary* would not arouse enough suspicion to trigger a duty to investigate.

## C.     Count 8: Receipt of Stolen Property

Lastly, the Joneses raise four arguments for dismissing the receipt-of-stolen-property claim, discussed below. The elements of this cause of action are: "(i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property." *Switzer v. Wood*, 247 Cal. Rptr. 3d 114, 121 (Ct. App. 2019); *see also* Cal. Penal Code § 496(a).

     First, the Joneses insist that the allegations don't support "even an inference of the essential element of criminal intent." (ECF 31, at 23.) It is true that the required intent cannot be established with "ordinary commercial defaults" or with innocent or inadvertent "misrepresentations or unfulfilled promises." *Siry Inv., L.P. v. Farkhondehpour*, 513 P.3d 166, 184 (Cal. 2022). But the wrongful acts alleged here go well beyond a few innocent missteps. According to the counterclaim, Jeff Jones failed to deposit cash receipts on "numerous" occasions, and Connie Jones willfully doctored QuickBooks records to conceal these takings. (*See* ECF 19, at 20.) Because the repeated misappropriations spanned years and were covered up with false accounting entries, this pattern is "consistent with a conclusion that defendants acted not innocently or inadvertently, but with careful planning and deliberation reflecting the requisite criminal intent." *See Siry*, 513 P.3d at 184.

     The Joneses' second argument is that the counterclaim fails to allege a qualifying "theft." (ECF 31, at 24.) They imply that the statute embraces only theft by false pretenses, which happened to be the situation in *Siry*. But theft "is the unlawful taking of another's property" and includes "larceny, embezzlement, larceny by trick, and theft by false pretenses." *People v. Miller*, 97 Cal. Rptr. 2d 684, 696 (Ct. App. 2000); *see also* Cal. Penal Code § 484(a) (defining "theft" to cover theft by false pretenses as well as "fraudulently appropriat[ing] property which has been entrusted to [defendant]"). The facts alleged in the counterclaim fit comfortably in the embezzlement category. The Joneses purportedly "misappropriated and/or concealed" "numerous ATM withdrawals, debit card charges, and cash," knowing that "the money was stolen," and subsequently employed it for their own ends. (ECF 19, at 34.) "They also charged what appear to be numerous personal expenses" to business debit cards. (*Id.* at 20.) These allegations adequately plead the element that "property was stolen or obtained in a manner constituting theft." *See Switzer*, 247 Cal. Rptr. 3d at 121.

     Third, the Joneses contend that, even if a theft is alleged, a "thief cannot receive the same stolen property from himself" and "be convicted of both burglary and receiving stolen

property." (ECF 31, at 24.) As for the first premise, the statute is explicit: "A principal in the actual theft of the property *may* be convicted" of receipt of stolen property. Cal. Penal Code § 496(a) (emphasis added). As for the latter premise, it is true that "no person may be convicted both" of receiving stolen property "and of the theft of the same property." *Id*. But that axiom—and the criminal double-jeopardy concerns that animate it—make no difference here. "A criminal conviction [] is not a prerequisite to [civil] recovery" under the receipt-of-stolen-property statute. *Bell v. Feibush*, 151 Cal. Rptr. 3d 546, 550 (Ct. App. 2013) (citing Cal. Penal Code § 496(a), (c)).

In their last objection, the Joneses maintain that the diversion of Harbor Foods employees' labor and services does not qualify as "stolen property" under the statute. (ECF 31, at 24.) To support this position, they point to *Lacagnina v. Comprehend Systems*, 236 Cal. Rptr. 3d 641 (Ct. App. 2018), which held that an individual's own "labor is not 'property' as that term is used in the Penal Code." *Id*. at 651. Of course, *Lacagnina* did not address whether the diverted labor of a *company's* employees—for which ascertainable wages have been paid but no benefit received—can constitute misappropriated "property" for receipt-of-stolen-property purposes. Regardless, the Court need not reach that issue. The alleged misappropriations of cash, standing alone, are sufficient to state a claim of receiving stolen property.

## CONCLUSION

Accordingly, the motion to dismiss counterclaims is **DENIED**.

Dated:  September 10, 2024

Andrew G. Schopler
United States District Judge